Filed 7/12/24  P. v. Vertiz CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>GUADALUPE ADAM VERTIZ,<br><br>    Defendant and Appellant. | G062086<br><br>(Super. Ct. No. 96CF0802)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Scott A. Steiner, Judge.  Reversed and remanded with directions.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski, Alan Amann, Paige Hazard, and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

This appeal by defendant Guadalupe Adam Vertiz is one of three appeals arising from the denial of a petition for resentencing pursuant to Penal Code former section 1170.95 (now Pen. Code, § 1172.6).[1] We already decided one of Vertiz's codefendant's appeals (*People v. Rivera* (Mar. 6, 2024, G061635) [nonpub. opn.] (*Rivera*)), in which we reversed the trial court's denial of the petition for resentencing. A majority of that panel concluded that there was no substantial evidence to support a theory of directly aiding and abetting second degree murder. The issue there was whether the defendants knew that one of their cohorts was armed with the knife used to kill the victim. Our concurring and dissenting colleague concluded that the trial court had relied on an incorrect legal standard, and thus reversal was necessary, but that substantial evidence could support a finding that the defendant—Rivera—knew one of his cohorts had a knife. That evidence was based on an earlier incident involving some of the same defendants in which a knife may have been present. In this appeal, however, Vertiz was *not* present at the earlier incident, and thus there is no substantial evidence that he knew the killer was armed with a knife. Accordingly, we reverse the order denying Vertiz's petition for resentencing and remand with instructions to grant the petition and to conduct a resentencing.

FACTS

I. *The First Incident on the Day of the Murder*

On March 14, 1996, at around 9:00 p.m., L.C., A.V., and several other friends left a quinceañera practice at a home on the corner of Wakeham and Oak Streets in Santa Ana. While they stood outside at the corner, a brown-colored car with four

---

[1] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We shall use the current Penal Code section number throughout our opinion. All statutory references are to the Penal Code unless otherwise stated.

2

occupants approached them and stopped a couple of feet away. Both L.C. and A.V. identified Rivera as the front seat passenger of the car before and at trial.

Rivera and codefendants Tapia, Diaz, and Castro got out of the car at the same time.[2] Rivera yelled "Lopers" and someone else said "Eastside." Rivera and his codefendants threw beer cans at L.C., A.V., and their friends. Rivera approached L.C. and spoke to him. L.C., A.V., and their friends backed away without responding to the taunts.

While Rivera was standing about 30 feet away, L.C. saw an object in Rivera's pocket with a shape resembling a knife. L.C. never saw Rivera remove that object from his pocket and saw no weapons. A.V. did not see Rivera in possession of any weapons. E.V. testified that, later that evening, L.C. told her Rivera had a knife that evening. L.C. denied telling E.V. Rivera had a knife.

At trial, A.V. testified one of the four men (possibly Diaz) came after him with a knife and tried to stab him in the stomach, but A.V. lifted his arm to block the stab and the attacker dropped the knife. A.V. then ran away. L.C. testified he did not see anyone get into a physical fight; he testified "there was no fight."

Rivera and the four codefendants went back to their car and drove off. After buying more beer, they went and picked up defendant Vertiz. After picking up Vertiz, defendants went to buy more beer.


II. *The Beating and Murder of Arroyo*

At 9:20 p.m. the same night, K.L., her boyfriend Cesar Arroyo, and her sister L.L. were walking northbound on Standard Street in Santa Ana on their way to the grocery store. A brown-colored car approached them from the opposite direction. As the car drove past, its five occupants stared at them. The car made a U-turn and pulled up

---

[2] Note that Vertiz was not present.

beside K.L., Arroyo, and L.L.  Rivera jumped out of the car and, with a beer can in his hand, asked Arroyo, "'Where you from?'"  Arroyo responded, "'I don't claim.'"  When Rivera asked him again, Arroyo insisted, "'Really, I don't claim.'"  Rivera proclaimed, "'We're from Lopers,'" or "'big, bad Lopers'" and threw the beer can at Arroyo.  K.L. interceded, and the beer can hit her on the head.

The other four defendants then jumped out of the car and, along with Rivera, started beating Arroyo.  Arroyo, who was five feet five inches in height and weighed 131 pounds, did not fight back.  One defendant was punching Aroyo in the stomach with his fist.

After a minute or two of being beaten, Arroyo fell to the ground against the fence.  He tried to cover and protect himself while Rivera and his codefendants continued to hit and kick him.  They continued to kick and hit Arroyo for five to six minutes as he lay on the ground.[3]  Tapia and Vertiz punched K.L. when she tried to pull them off of Arroyo.

At some point, Tapia stepped away and stood behind L.L.  A few seconds later, three of the defendants got back into the car while another stood at the back of car and waited.  Arroyo managed to stand up.  One defendant, identified as wearing a blue shirt and dark, square pants, went up to Arroyo and pushed him in the chest.  Arroyo started walking, then stumbled and fell to the ground.

The defendant who pushed Arroyo ran back to the car.  Once all five were inside the car, they drove away.

L.L. went to seek help, and police officers arrived shortly thereafter.  Arroyo had been stabbed several times and later died of his wounds.

---

[3] K.L. testified that while Arroyo was on the ground the defendants hit and kicked him.  L.L. testified four of the five defendants "piled on" Arroyo as he lay on the ground and one defendant stood behind her.

4

The police officers took K.L. and L.L. to a liquor store where the officers had pulled over a car matching that of the defendants. Rivera and his four codefendants were inside the car. Rivera sat shirtless in the front passenger seat. A steak knife was found in the car's locked glove compartment. After defendant Castro was arrested, his home was searched and a knife was found underneath a mattress in the garage.

At trial, L.L. identified Rivera and all codefendants as participating in the attack on Arroyo. When asked how many of them struck Arroyo, L.L. testified, "The five of them." Neither K.L. nor L.L. saw any weapons or objects in the defendants' hands other than the beer can used by Rivera.

III. *The Pathologist's Testimony*

Joseph Halka, a pathologist for the Orange County Sheriff-Coroner, performed an autopsy on Arroyo's body. Halka testified that Arroyo died from exsanguination (he bled to death) caused by a stab wound to the heart and left lung.

Halka found a total of seven stab or slash wounds. Before Arroyo died, emergency surgery had been performed that altered "some of the contours" of the wounds. The wound to the heart was caused by a knife with a "two-edged configuration," meaning it was sharp on both edges or sides. A stab wound to Arroyo's left kidney was potentially fatal and also appeared to have been caused by a "two-edged configuration" knife. The remaining knife wounds, including defensive slash and "punctate" wounds, were nonfatal and could have been caused by either a two-edged knife or a one-edged knife. Arroyo also had bruises and contusions on his body.

IV. *Tapia's Police Interview and Testimony*

Police investigators interviewed Tapia early on March 15, 1996. Tapia admitted he and his fellow gang members had attacked Arroyo but repeatedly denied having used a weapon. Tapia told the investigators that, before the attack, "the other

5

guys said, 'watch that guy,'" with reference to Arroyo. Diaz (the driver) stopped the car, everyone got out, and they started fighting Arroyo. When asked why Tapia was fighting Arroyo, Tapia responded, "But was very—if you see him in the street like that, you're going to figure he's a gang member, and you're going to stop him, and you're going to say hey, you understand me?" Tapia claimed he did not have any weapons and he did not stab Arroyo.

At trial, Tapia testified he had stabbed Arroyo and lied to police when he was arrested. He testified he had a knife in his pocket which he had obtained from work at a Del Taco, where he used it to cut up boxes. The knife was "straight" (as opposed to being a folding knife), had a three-inch blade and a three-inch handle, and was sharp on both edges. He did not have a sheath or pouch for the knife but on March 14, 1996, he was wearing oversized pants with huge pockets which could accommodate the knife. Tapia testified he had forgotten about the knife when he left work at 4:00 p.m.

Tapia testified that he and his codefendants did not have any discussion about getting into a fight. Tapia had been drinking earlier that night and was drunk. Tapia claimed that as the five drove past Arroyo he screamed "Little Minnie Locotes" and lifted his hand with five fingers outstretched at a 45-degree angle. The car made a U-turn. All five got out of the car and attacked Arroyo. Tapia took out the knife and stabbed Arroyo. Tapia remembered stabbing Arroyo a few times. Tapia did not remember how it happened because he was drunk and did not recall why he stabbed Arroyo. When he realized he was stabbing Arroyo with a knife, Tapia got scared and ran back to the car. He did not think he had seriously injured Arroyo because Arroyo was still standing and walking.

According to Tapia, he and his codefendants got back into the car and drove off. They returned to the place where they had attacked Arroyo and saw an ambulance there. They next drove to a liquor store to buy more beer. Soon thereafter, they were stopped by police officers and arrested.

At first, Tapia claimed he could not remember what he did with the knife. He then testified that he had tossed the knife out of the driver's side window while on the way to the liquor store. Tapia claimed none of his codefendants knew he had a knife, that he had stabbed Arroyo, or that he had tossed the knife out the window.

Regarding the earlier confrontation with L.C. and A.V.'s group, Tapia claimed he, Rivera, Diaz, Castro, and two brothers whose names he did not know were in the car when someone in the group looked at them and said something, which led Tapia and his codefendants to stop the car. Tapia and his codefendants threw beer cans at the people in L.C. and A.V.'s group. Tapia testified that neither he nor any of his codefendants got close to or chased after anyone. He was not sure whether he or any of his codefendants shouted "Lopers" as "the music was on loud." He denied using the knife during the incident.

PROCEDURAL HISTORY

I. *The Charges and Trial*

Vertiz and all four codefendants were charged by amended information filed in 1997 with the murder of Arroyo (§ 187, subd. (a); count 1). Rivera, Tapia, Diaz, and Castro were charged in count 2 with the attempted murder of L.C. and in count 3 with the attempted murder of A.V. (§§ 664, 187.) It was alleged the attempted murder was committed willfully, deliberately and with premeditation.

In May 1998, Vertiz and the codefendants were tried together by jury. Outside the jury's presence all defendants admitted they were members of the Lopers, the Lopers was a criminal street gang, and any alleged crimes they were convicted of committing had been committed for the benefit of the gang. After the prosecution rested its case-in-chief, the court granted a defense motion pursuant to section 1118.1 acquitting Rivera, Tapia, Diaz, and Castro on count 2 (attempted murder of L.C.) and dismissing the enhancements associated with that count.

7

The jury was instructed on aiding and abetting, conspiracy, murder, express and implied malice, attempted murder, second degree murder resulting from an unlawful act dangerous to life, and the lesser included offenses of assault with a deadly weapon, simple battery, and simple assault.[4]

The jury convicted all defendants of second degree murder on count 1. The jury found that Tapia personally used a knife at the time of the commission of the murder.

The trial court sentenced Vertiz to a term of 30 years to life for the murder conviction with a consecutive term of 1 year for a prior conviction for a total of 31 years to life.

Vertiz and the other defendants appealed. In an unpublished opinion, a panel of this court remanded for reconsideration of presentence custody credits award but otherwise affirmed the judgment and sentence. (*People v. Diaz et al.* (Mar. 28, 2001, G023892, G025088).)


II. *Vertiz's Resentencing Petition*

In June 2019, Vertiz filed a petition to vacate his murder conviction and for resentencing pursuant to section 1172.6. On June 4, 2021, the prosecutor conceded that Vertiz had made a prima facie showing of entitlement to relief under section 1172.6, and the court subsequently issued an order to show cause.

On December 8, 2022, the trial court conducted an evidentiary hearing under section 1172.6, subdivision (d) on Vertiz's resentencing petition. At the conclusion of the hearing, the court denied the petition, stating only that the evidence supported liability for aiding and abetting implied malice murder. Vertiz timely appealed.

---

[4] Specifically, the jury was instructed on a natural and probable consequences theory of aiding and abetting liability for murder.

8

DISCUSSION

Vertiz raises a single issue on appeal, which is whether substantial evidence supports the court's ruling that Vertiz was guilty of murder notwithstanding the changes made by Senate Bill 1437. In particular, he contends there was no evidence that he knew the killer had a knife, which would be the only way to reach the conclusion that he harbored the necessary mens rea for aiding and abetting second degree murder. We agree.

I. *Standard of Review*

A trial court's denial of a section 1172.6 petition following a hearing under section 1172.6, subdivision (d) is reviewed under the substantial evidence standard. (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).) We review the record in the light most favorable to the order denying the petition to determine whether the evidence is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Ibid*.) "[W]e defer to the trial court's implicit credibility findings and accept all reasonable inferences from the evidence." (*People v. Oliver* (2023) 90 Cal.App.5th 466, 482.) Substantial evidence is not just any evidence but must constitute substantial proof. (*People v. Bell* (2020) 47 Cal.App.5th 153, 179.) We presume the court has made all necessary implied findings in support of the judgment or order. (*People v. Francis* (2002) 98 Cal.App.4th 873, 878.)

"[W]here there is an issue as to whether the trial court misunderstood the elements of the applicable offense, the case presents a question of law which we review independently." (*Reyes*, *supra*, 14 Cal.5th at p. 988.)

II. *Resentencing Under Section* 1172.6

By legislation effective January 1, 2019, the Legislature amended the felony-murder rule and eliminated the natural and probable consequences theory of

9

liability as a basis for a murder conviction. (Stats. 2018, ch. 1015, § 2; see *Reyes*, *supra*, 14 Cal.5th at p. 984.) The latter result was accomplished by amending section 188 to provide that, except in cases of felony murder, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought." (§ 188, subd. (a)(3) as amended by Stats. 2018, ch. 1015, § 2.)

Section 1172.6 lays out a procedure by which convicted murderers who could not be convicted under the law as amended could retroactively seek relief. (*People v. Lewis* (2021) 11 Cal.5th 952, 957.) To obtain relief under section 1172.6, a petitioner must file a petition alleging these three conditions have been met: (1) the petitioner was convicted based on a pleading "that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime" (§ 1172.6, subd. (a)(1)); (2) the petitioner was convicted of murder or attempted murder (*id*., subd. (a)(2)); and (3) the petitioner could not now be convicted of murder or attempted murder as those offenses are presently defined (*id*., subd. (a)(3)).

If the court determines the petitioner made a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold a hearing "to determine whether to vacate the murder, attempted murder, or manslaughter conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced." (§ 1172.6, subd. (d)(1).) "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (*Id*., subd. (d)(3).) At the evidentiary hearing, the resentencing court sits as an independent fact finder. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.)

III. *The Trial Court Erred by Denying Vertiz's Petition for Resentencing*

A.  Aiding and Abetting Implied Malice Murder

Murder is committed with implied malice when "the killing is proximately caused by '"an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life."'" (*People v. Knoller*, *supra*, 41 Cal.4th at p. 143.)  "'To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical.'" (*People v. Jennings* (2010) 50 Cal.4th 616, 643.)

A defendant may directly aid and abet an implied malice murder.  (*Reyes*, *supra*, 14 Cal.5th at p. 990.)  "'[N]otwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.'" (*Ibid.*)

The elements of aiding and abetting an implied malice murder were recently confirmed by the California Supreme Court in *Reyes*:  "'[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea.  [Citation.]  In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act.  For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act.  Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is

11

dangerous to human life, and acting in conscious disregard for human life.'" (*Reyes,*
*supra*, 14 Cal.5th at pp. 990-991.)

In *Reyes*, the California Supreme Court clarified what mental state is
necessary to impose liability for aiding and abetting implied malice murder. In *Reyes*, the
defendant was convicted of second degree murder under the natural and probable
consequences theory for his role in a gang-related killing. (*Reyes, supra*, 14 Cal.5th at
p. 984.) The defendant met with a group of gang members in a park, where one gang
member showed the group a revolver he was carrying. (*Id.* at p. 985.) Several hours
later, the defendant and several other gang members set off on their bicycles to an area on
the edge of territory claimed by a rival gang. (*Ibid.*) One of the bicycle riders called out
for a passing car to stop. (*Ibid.*) The car sped up instead, and the group chased after it.
(*Ibid.*) While the group was stopped at an intersection, the car they were chasing made a
U-turn and drove past them. (*Ibid.*) There was a gunshot, and the riders fled in different
directions. The driver of the car had been struck by a single gunshot. (*Ibid.*) The
defendant was not the shooter. (*Id.* at p. 989.)

The trial court denied the defendant's section 1172.6 petition on the ground
that the act of riding into rival gang territory with several other gang members, one of
whom was armed, was dangerous to human life, the defendant was aware that act was
dangerous to human life, and the defendant deliberately acted with conscious disregard
for that danger. (*Reyes, supra*, 14 Cal.5th at pp. 986-987.) The Court of Appeal affirmed
the trial court's decision. (*Id.* at p. 987.) The Supreme Court, reversing the Court of
Appeal, concluded the defendant's murder conviction could not be sustained under either
a direct perpetrator or aiding and abetting implied malice murder theory. (*Id.* at p. 992.)

Relevant to the matter at hand is the Supreme Court's discussion of aiding
and abetting implied malice murder. After reciting the definition and elements of that
theory of liability, quoted above, the court stated, "the trial court did not appear to
recognize that implied malice murder requires, among other elements, proof the aider and

12

abettor's knowledge and intent with regard to the *direct perpetrator's* life endangering act." (*Reyes, supra*, 14 Cal.5th at p. 991.) The trial court erred by finding the life-endangering act was traveling with other gang members, one of whom was armed, into rival gang territory. (*Id.* at pp. 991-992.) The correct focus, the Supreme Court explained, is on the acts of the direct perpetrator: "[I]mplied malice murder requires attention to the aider and abettor's mental state concerning the life-endangering act committed by the direct perpetrator, such as shooting at the victim." (*Id.* at p. 992.) "Here, assuming the life-endangering act was the shooting, the trial court should have asked whether [the defendant] knew that [the other gang member] intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Ibid.*)

### B. Substantial Evidence Does Not Support Denial of Vertiz's Resentencing Petition

#### 1. The life-endangering act was the stabbing of Arroyo.

To determine Vertiz's liability for aiding and abetting implied malice murder, we first consider what constituted the perpetrator's life-endangering act. *Reyes* teaches that "implied malice murder requires attention to the aider and abettor's mental state concerning the life endangering act *committed by the direct perpetrator*, such as shooting the victim." (*Reyes, supra*, 14 Cal.5th at p. 992, italics added.) The evidence at trial, Halka's testimony in particular, established the cause of Arroyo's death as a stab to the heart from a double-edged knife. The evidence did not support any other cause of death. Arroyo had bruises and contusions on his body from the beating he received, but there is not substantial evidence the beating, absent the knife wounds, was the cause of his death or contributed to it.

13

The direct perpetrator, therefore, was the person who stabbed Arroyo and the life-endangering act committed by the perpetrator was the stabbing. The gang beating in itself was not the act dangerous to human life for purposes of aiding and abetting implied malice murder. (See *Reyes, supra*, 14 Cal.5th at p. 991 ["implied malice murder requires, among other elements, proof of the aider and abettor's knowledge and intent with regard to the *direct perpetrator's* life endangering act"]; *People v. Powell* (2021) 63 Cal.App.5th 689, 713, fn. 27 ["The relevant act is the act that proximately causes death"].)

No substantial evidence supports a finding that Vertiz was the direct perpetrator, and the Attorney General does not contend he was. To determine whether Vertiz had the requisite mens rea for aiding and abetting implied malice murder, the questions to be answered are whether Vertiz: (1) knew the perpetrator intended to stab Arroyo; (2) intended to aid the perpetrator in stabbing Arroyo; (3) knew that stabbing Arroyo was dangerous to human life; and (4) acted in conscious disregard for life. (See *Reyes*, *supra*, 14 Cal.5th at p. 991.)

The Attorney General's argument fails at the first question. There is no evidence Vertiz knew that Tapia (or anyone else) had a knife, and thus no evidence that Vertiz knew Tapia (or anyone else) intended to stab the victim. It is important to note in this regard that Vertiz was not present at the earlier assault that evening in which one of the codefendants was seen with a knife. Moreover, the duration of the assault itself cannot support an inference that Vertiz knew about the knife because there is no evidence that the knife was being used the entire time. There was no evidence of excessive blood loss, or any blood found on Vertiz's clothing. Additionally, at one point during the assault, Vertiz turned away when one of the victim's female companions, K.L., scratched Vertiz and tried to pull him off of the victim, prompting Vertiz to turn and assault K.L. Thus, there simply is no evidence from which one could conclude, *beyond a reasonable doubt*, that Vertiz knew about the knife.

14

The Attorney General's argument seems to boil down to: members of the group had knives, therefore, everyone must have known that fact. In support of this argument, the Attorney General relies on the testimony of a gang expert from the trial, who stated, "When gang members go into rival gang territory and there is a weapon in the vehicle, that most oftentimes all of the members in there know that there is a weapon in there." The expert's testimony cannot, however, serve as the sole evidence of guilt (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1097 (conc. & dis. opn. of Cuéllar, J.)) and, outside the expert's testimony, there was no substantial evidence that Vertiz knew any of the other defendants had a knife. Indeed, the prosecution's expert also testified that gang members sometimes act spontaneously and that whether or not a gang member would tell fellow gang members he had a knife "would be dependent completely on the totality of the circumstances." The expert acknowledged that on a prior occasion he had testified he did not know whether or not most gang members would tell anybody if they were carrying a knife. More generally, the notion that mens rea can be assumed from the mere presence of a weapon would all but eliminate the mens rea requirements set forth in *Reyes*. Such purely speculative reasoning is not substantial evidence.

The lack of solid evidence of Vertiz having or knowing about a knife does not mean no one in the group had a knife. After all, Arroyo died of a stab wound and he did not stab himself. But it does mean knowledge of a knife cannot be imputed to Vertiz.

The lack of solid evidence to prove Vertiz stabbed Arroyo or knew about the knife and aided the person who did, explains why the prosecutor at trial relied so heavily on the natural and probable consequences theory to seek a murder conviction. In closing, the prosecutor argued there "was no need to prove knowledge of a knife." The prosecutor stressed that point: "We started up with a fight, and we ended up with someone who was murdered. That's all that has to be proven. That's why . . . I didn't spend a lot of time in trying to prove to you who the stabber was." Later, the prosecutor repeated that argument: "You don't have to prove that they all did the stabbing. If they

15

all went out to beat up a rival that night, and that's what they did and a death resulted, and that death is a natural and probable consequence, that's it."

The prosecutor's closing argument, of course, is not evidence and does not control our decision or that of the trial court. It is, however, confirmation of the lack of solid evidence that Vertiz knew one of his codefendants had a knife, the codefendant intended to stab Arroyo with the knife, and Vertiz aided the codefendant in stabbing Arroyo.

*People v. Schell* (2022) 84 Cal.App.5th 437 (*Schell*), though similar in many respects, demonstrates by distinction why Vertiz could not be convicted for aiding and abetting implied malice murder. In *Schell*, eight gang members attacked and killed a man whom they suspected had called the police to complain the gang had disturbed the peace. (*Id.* at p. 440.) The victim used a baseball bat to fend off the attackers until one of the attackers grabbed the bat and used it to beat the victim. Another attacker hit the victim in the head with a shovel. The defendant participated in the attack with his hands and fists. (*Ibid.*) The victim was stabbed with a knife, but the prosecution could not prove the defendant was the stabber. (*Ibid.*)

The defendant brought a petition for resentencing under section 1172.6. (*Schell, supra*, 84 Cal.App.5th at p. 441.) At the conclusion of an evidentiary hearing, the trial court found the defendant's participation in the gang assault resulting in death rendered him liable for second degree implied malice murder and denied the petition. (*Ibid.*) The trial court made clear its ruling "'does not depend on the knife.'" (*Ibid.*)

The Court of Appeal agreed with the trial court and affirmed. (*Schell, supra*, 84 Cal.App.5th at p. 440.) The defendant was one of at least eight gang members or associates who had viciously assaulted the victim. (*Id.* at p. 443.) The trial court could reasonably infer that the defendant knew the victim was being hit in the head by a shovel and bat and intended to aid those acts. (*Ibid.*) The defendant was at the scene when a cohort wrested the bat from the victim. During the attack, the blows to the victim

16

with the bat and shovel were loud enough to be heard by several neighbors and cries of "'Stop it'" and "'you're killing him'" could also be heard. (*Ibid*.) The defendant was so deep into the fray that his pants, underwear, and jacket became stained with the victim's blood. (*Ibid.*) The appellate court concluded: "Appellant's presence at the scene, his participation in the attack on the victim, his companionship with other perpetrators, his conduct before and after the crimes, and his motive of retaliation for disrespect all support the finding that he aided and abetted an implied malice murder. [Citation.] As the People note, '[a]ppellant did not need to specifically know that someone would strike [the victim] with [a shovel and bat] in that particular manner to be liable under an implied malice theory. It suffices that he knew he was aiding in a violent attack, knew dangerous weapons were being used against [the victim], and intended to stop [the victim] from escaping or defending himself by helping the perpetrators surround and hit him.'" (*Ibid*.)

In *Schell*, the perpetrator's mental state could be imputed to the defendant, without reference to the knife, because the evidence supported a finding that he knew other gang members were using other dangerous weapons to attack the victim. (*Schell*, *supra*, 84 Cal.App.5th at p. 443.) Although the present case, like *Schell*, is an attack by a group of gang members on a single person, unlike *Schell* there was no solid evidence that Vertiz knew someone in his group had a knife and intended to use it. There was no evidence of anybody seeing a weapon (except for a thrown beer can), having seen a weapon wrested from Arroyo, or hearing noises indicating weapons were being used. There was no evidence to suggest Vertiz's clothing, or anybody else's was bloodied in the attack on Arroyo.

17

DISPOSITION

The postjudgment order denying Vertiz's resentencing petition is reversed and the matter is remanded with directions to grant the petition, vacate Vertiz's murder sentence, and resentence him on any remaining counts and enhancements.


SANCHEZ, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.

18